**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOSE AYALA, SR.,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **TASTY BAKING COMPANY,** | **NO. 22-3849** |
| **LOCAL 6 BAKERY CONFECTIONERY** | |
| **AND TOBACCO WORKERS** | |
| **INTERNATIONAL, JACK GARRETT,** | |
| **CHRISTINE JOHNSTON, and HALEY** | |
| **ANGELINE** | |
| **Defendants.** | |

**OPINION**

Plaintiff Jose Ayala, Sr., brought this employment discrimination case against Local 6

Bakery Confectionery and Tobacco Workers International ("Local 6"), Tasty Baking Company

("Tasty Baking"), Jack Garrett, Christine Johnston, and Haley Angeline under 42 U.S.C. § 1981;

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; the

Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the Family

and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*[1]  Defendants have moved for

---

[1] Specifically, he brings three claims under 42 U.S.C. § 1981: retaliation, hostile work environment, and disparate treatment (race).  His claims under Title VII are for hostile work environment and disparate treatment (race and gender), and retaliation.  Under the ADA he brings claims for disability discrimination, failure to accommodate, and retaliation.  And he brings claims under the FMLA for interference and retaliation.  He also initially brought various state-law discrimination claims, which were dismissed by stipulation.  Although his Complaint contains some language which hints at gender discrimination, it contains nothing to flesh out this possibility.  In any case, during Ayala's deposition, his counsel said "[F]or the record, we're not making a claim for gender discrimination in this case. . . .  In my opinion, I think this is a race case and a disability case."

1

summary judgment on all claims, pursuant to Federal Rule of Civil Procedure 56, in the context

of which they move to strike Ayala's filings in opposition as untimely and noncompliant with

Court orders, policies and procedures, pursuant to Federal Rule of Civil Procedure 12(f).[2]  For

the reasons that follow, Defendants' Motion to Strike will be granted and their Motion for

Summary Judgment will be granted in part and denied in part.

## I.   DEFENDANTS' MOTION TO STRIKE

Defendants' Motion to Strike seeks to strike Ayala's filings in opposition to its Motion

for Summary Judgment because the filings do not comport with Federal Rule of Civil Procedure

56, this Court's policies and procedures, and the Scheduling Order which the Court issued after

holding a preliminary trial conference pursuant to Federal Rule of Civil Procedure 16.

Federal Rule of Civil Procedure 56 requires that a party "asserting that a fact cannot be or

is genuinely disputed must support the assertion" by "citing to particular parts of materials in the

record" and provides that, if a party fails to do so, the court may "consider the fact undisputed for

purposes of the motion."  Fed. R. Civ. P. 56(c), (e).  Section V of this Court's Policies and

Procedures operationalizes Rule 56 and describes the summary judgment briefing process that

parties must follow.  This process was explained to the parties during a preliminary pretrial

conference scheduled pursuant to Federal Rule of Civil Procedure 16 and was also included in

the scheduling order issued by the Court following that conference.

It is as follows:  When one party intends to move for summary judgment, that party shall

---

[2] Defendants have also moved to exclude the testimony of Ayala's expert Dr. Noa Glick, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Ayala filed no response in opposition, so Defendants' Daubert Motion will be granted as uncontested, *see* E.D. Pa. Local Civ. R. 7.1(c) ("In the absence of a timely response," a motion "may be granted as uncontested.") so  Dr. Glick's opinions and testimony will be excluded.

initiate a process whereby the parties shall meet, confer, and develop a single joint appendix of all exhibits that may be referenced in their briefs.  On filing its motion for summary judgment, the moving party is required, along with its brief, to submit a separate Statement of Undisputed Material Facts containing a numbered, paragraph-by-paragraph recitation of facts with specific citations to the joint appendix in support of each fact as to which the moving party contends no genuine issue exists.  The party opposing a motion for summary judgment is then required to submit along with is brief a document admitting or denying each fact as stated by the moving party and may then provide its own Statement of Disputed Material facts—again with pinpoint cites to the record.

The procedures are designed to accord with the dictates of Rule 56 and of Rule 1, which requires that the Rules "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  The purpose is to effectuate speedy resolution of summary judgment motions by requiring the parties to identify which facts are not in dispute and then focus the Court's attention on the matters they, having lived with a matter for months and sometimes years, have concluded are in dispute and where in the record the Court should look to evaluate that dispute.  These procedures help the Court decide the motion efficiently, assisted by the parties' thorough grasp of the record.

According to Defendants (and Ayala does not dispute their account), "[i]n the weeks leading up to the filing of [their] Motion for Summary Judgment," they "reached out to [Ayala]'s counsel about the joint appendix and documents Plaintiff would like to include," and "the only item [Ayala]'s counsel requested to be included in the joint appendix was [Ayala]'s complete deposition transcript," which Defendants included in the Joint Appendix submitted with their Motion.

Defendants then filed their Motion, along with the Joint Appendix.  It took some time for

Ayala to respond.  He sought, and received, several extensions of the filing deadline for his responsive brief:  First it was due May 7, 2024, and then June 17.  Then, on June 17, Ayala sought further extension to July 1.  Although his request was denied, Ayala filed his opposition late anyway (without any explanation or acknowledgement of his tardiness), across two filings— one on July 3, and one on July 4.  Each filing included a series of loose, unnamed exhibits (16 exhibits with the first filing and 70 with the second).  Neither filing used, supplemented, or referenced the Joint Appendix.

To be sure, the Court's policies do provide a way for a nonmoving party to submit additional exhibits:  "[I]t may do so at the time it files its opposition brief" as an "addendum to the joint appendix," which, like the rest of the joint appendix, "shall be consecutively Bates stamped, beginning at the page number where the joint appendix left off," and "shall include a table of contents."  Ayala did not avail himself of this option.  In fact, he does not engage with the joint appendix in any way—his memorandum of law in support of his opposition does not even cite it.  The rules warn clearly that the Court "will not consider material not included in the appendix."

The Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "[T]he District Court's decision to employ any given sanction," including striking pleadings, "is fully within the discretion of that Court."  *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).  And, "[i]t is beyond question that the District Court has the authority to strike filings that fail to comply with its local rules."  *Id.* at 614.  Even the apparently "harsh result" of "dismissing a motion or an appeal" when a party "fails to strictly comply with the terms of a local rule" is not an abuse of discretion.  *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 214 (3d Cir. 2000).

4

Here, Defendants' Motion to Strike will be granted, and Ayala's filings in opposition to Defendants' Motion for Summary Judgment will be stricken in that failure to follow these rules is not just a violation of a small formality or technicality:  It has real consequences—for the parties in this case and those in others.

First, the failure to follow the Court's orders undermines the Court's authority:  "An attorney who . . . "deliberate[ly] disregard[s]" court orders "offends the dignity and authority of the court and thereby obstructs the administration of justice."  *Com. of Pa. v. Loc. Union 542, Int'l Union of Operating Engineers*, 552 F.2d 498, 509 (3d Cir. 1977); *see also Eleven Vehicles*, 200 F.3d at 214 ("Local court rules play a significant role in the district courts' efforts to manage themselves and their dockets.")

Second, allowing Ayala to flout summary judgment procedure—particularly his failure to cite to, or reference in any way, the Joint Appendix—puts an unwarranted burden on the Court. That is because, regardless of the deficits of Plaintiff's briefing, on a summary judgment motion the Court is, nevertheless, "required to conduct a full analysis to determine whether granting summary judgment [is] appropriate."  *Weitzner*, 909 F.3d at 614.  "Even in a case . . . where a plaintiff does not respond in any way to a defendant's motion for summary judgment, before granting summary judgment, the Court must consider whether the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.'"  *Patra v. Pennsylvania State Sys. of Higher Educ.*, 779 Fed. App'x 105, 108 (3d Cir. 2019) (quoting *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990)) (emphasis added).  Thus, the contumacious refusal of the Plaintiff to engage in the summary judgment pre-filing process is not just a failure of collaboration, it forces the Court to step into the breach thus taking up valuable time which could otherwise be used to expeditiously

adjudicate other matters.  *See e.g.*  Fed. R. Civ. P. 1.[3]

## II.   MOTION FOR SUMMARY JUDGMENT

### A.  Factual Background

In that Ayala's opposition has been stricken, the following facts are found in the Joint Appendix, including Ayala's deposition transcript.  These facts are not in dispute except where indicated.  As a preliminary matter, the parties have stipulated that any allegations regarding events that took place before August 31, 2021, should not be considered.

Ayala is a Hispanic man.  He started working at Tasty Baking, a commercial bakery, in 2012; he became a machine operator there in 2016.  In 2019 he sustained a serious workplace injury to his shoulder and cervical spine.  After his injury Ayala took nearly a year of FMLA leave for surgery and recovery.  He returned in September 2020, and then—for the rest of the year and intermittently in 2021—requested accommodations in the form of lighter-duty assignment.  Then, in February 2021, Ayala used FMLA leave again to attend to the needs of his dying son.  In fall 2021 he took further FMLA leave when his injury worsened, and then in April 2022 he again used FMLA leave on an indefinite basis.  He has not actively worked at Tasty Baking since then.

Around the time Ayala returned from his injury-related leave, Defendant Garrett was transferred from Georgia to Philadelphia, where he became one of Ayala's supervisors.  The ensuing interactions between Garrett and Ayala give rise to many of Ayala's claims.  These facts

---

[3] Further, the egregious nature of Ayala's noncompliance justifies granting Defendants' request for attorneys' fees as additional sanction.  *See Pearlstine v. United States*, 649 F.2d 194, 196 (3d Cir. 1981) (A court "may award reasonable attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons") (quotations removed).  Accordingly, Defendants shall submit an itemized list of fees and costs incurred in the preparation of their Motion to Strike.

*are* disputed: Garrett, Ayala testified in deposition, subjected him "[d]ay in and day out" to different forms of "discrimination" and "retaliation" and "abuse[d]" him frequently, including with derogatory comments that explicitly referred to Ayala's race.  For instance, Ayala testified that "on a regular basis," Garrett told him to "sit [his] Puerto Rican ass down."  In one case, when Ayala arrived at work to a mess left by the previous shift Garrett told him to clean it up and said, "[you] clean like a Mexican."

As to his disability, Ayala testified that Garrett said, "Fuck you, you're not injured, do the job, if you can't do the job . . . you'll be replaced."  He further testified that "several times," Garrett told him, "you don't have no fucking injury, you're faking your injury."  And other times, Ayala testified, the harassment was not explicitly discriminatory:  "Shut the fuck up and do your job," "do this or there's the fucking door."  On one occasion, another supervisor "had to get in between [Ayala and Garrett] because [Garrett] was in [Ayala's] face talking aggressive[ly] and actually spitting while he was talking."

Ayala also testified that he was harassed by his co-workers.  Nobody, he says, did anything to stop the harassment.

Defendants tell a different story.  Garrett, for instance, attests in his declaration that as a manager he "had an open[-]door policy" and frequently tried to "assist" Ayala with his "issues," just "as [he] would for any employee."  He attests further that he did not tell him to "sit [his] Puerto Rican ass down"—at least not during one particular meeting.  Garrett attests further that actually *Ayala* was the one "acting in a threatening manner" towards *him*.  Garrett and the other Defendants attest further that Ayala had a "wonderful relationship" with "management" (or, at least with Defendants Johnston and Angeline).

In addition to the particulars of his harassment, Ayala testified that Defendants also

refused to accommodate him after his injury.  He needed to work "on light duty" but was not

"permit[ted]" to do light-duty tasks—instead, he testified, he was required to do more difficult

labor (namely, to work a machine called the ADCO-70 on the "pie line," which Ayala calls "the

most difficult machine [o]n the production floor to operate).  Defendants, on the other hand, say

that they never refused any accommodations.

It is undisputed that Ayala was suspended twice.  Each time, he was suspended without

pay for three days and, he testified, threatened with termination.  He maintains that both

suspensions were discriminatory and retaliatory; Defendants say that the reason for Ayala's

suspensions was that he got into arguments and acted in a "threatening" manner.  Both

suspensions, the parties agree, were "overturned" after Ayala met with Garrett and Johnston, and

he was given backpay for the days he was suspended.

### B.  Legal Standard

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Inferences to be drawn from the

underlying facts contained in the evidential sources must be viewed in the light most favorable to

the party opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*,

833 F.2d 32, 34 (3d Cir. 1987); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) (cautioning

that "courts are required to view the facts and draw *reasonable* inferences" in favor of the

nonmoving party (emphasis added)).  But "[w]hen opposing parties tell two different stories, one

of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Id.* (citation omitted). A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

## C.  DISCUSSION

### i.  *The McDonnell Douglas framework*

Discrimination and retaliation claims involving indirect evidence of discrimination, like those brought by Ayala under Section 1981, Title VII, the ADA, and the FMLA, are evaluated under the burden-shifting framework announced in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).[4]

Pursuant to *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of

---

[4] *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999) ("We analyze section 1981 claims under the familiar *McDonnell Douglas* shifting burden framework used in Title VII discrimination cases"); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (*McDonnell Douglas* "applies to ADA disparate treatment and retaliation claims"); *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 151 (3d Cir. 2017) (An "FMLA retaliation claim is assessed under the burden-shifting framework established in *McDonnell Douglas*"). Note that hostile-work-environment claims are not analyzed under the *McDonnell Douglas* framework, so Ayala's hostile-work-environment claims under Section 1981 (Count I) and Title VII (Count II) will be addressed separately below.

employment discrimination.  The *prima facie* requirement "'is not onerous' and poses 'a burden easily met.'" *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Then, once a plaintiff has established the *prima facie* case, "the burden shifts to the employer to provide a legitimate . . . reason for its conduct." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (citation omitted).  If the employer does so, the burden shifts back to the employee, which must produce "evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citations omitted). To carry this burden, the plaintiff must offer "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

> ## ii.   *Ayala's disparate-treatment and retaliation claims under Section 1981, Title VII, and ADA*
>
> ### 1.  *Disparate treatment: Race discrimination under Section 1981 and Title VII*

With respect to Ayala's race-discrimination claims under Section 1981 and Title VII,[5] he must first show that: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and, (4) the adverse employment action

---

[5] As noted above, the substantive elements of a disparate treatment claim under Section 1981 are the same for Title VII, and both types of claim are analyzed under the *McDonnell Douglas* framework.  *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267 (3d Cir. 2010).

occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).  Defendants argue that Ayala cannot establish a *prima facie* case because he did not experience an adverse employment action (the third prong) or any circumstances that could give rise to an inference of discrimination (the fourth prong).

Until recently, in the Third Circuit, an adverse employment action for the purpose of Title VII and Section 1981 was "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015).  But the standard articulated in *Jones* has changed.  In *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), the Supreme Court held that a disparate-treatment plaintiff "need not demonstrate that the asserted adverse employment action was a 'serious and tangible' employment-related harm."  *Id.*  The harm shown need not be "'serious,' 'significant,' 'substantial,' or 'any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.'"  *Peifer See Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (quoting *Muldrow*, 144 S. Ct. at 974).  Instead, an adverse employment action in the disparate-treatment context "means simply that the employee suffered 'some harm' to a term or condition of employment—in other words, that the employer treated the employee 'worse' because of a protected characteristic."  *Id.* (same).

Defendants argue that Plaintiff here has not suffered any adverse employment action in that: (1) he is still a Tasty Baking employee (*i.e.*, he was not fired); (2) his July 2021 suspension and his reassignment to the Pie Line are time-barred because they occurred before August 31, 2021; (3) neither his July 2021 suspension nor his February 2022 suspension qualifies as an adverse action because each was overturned after being issued and Ayala was paid for the time

he was suspended; and, (4) Garrett's alleged abuse cannot constitute an adverse employment action because "it does not represent a significant change in [Ayala]'s terms of employment, result in economic loss, or otherwise impact his employment status."

At least one of Ayala's allegations counts as an adverse employment action (and is not time-barred): his second "three-day suspension with intent to terminate."  As Defendants acknowledge, Ayala was not paid during those three days and therefore clearly suffered "'some harm' to a term or condition of employment."  *See Peifer*, 106 F.4th at 277; *see also Seeney v. Elwyn, Inc.*, 409 F. App'x 570, 574 (3d Cir. 2011) ("[A] three-day suspension without pay may be considered an adverse employment action.").  Defendants argue that the suspension does not qualify because it was "overturned" and because Ayala "was paid for the time he was out of work."  To support their argument that, in essence, an adverse action may become a nonadverse action, Defendants cite *Gonzalez v. Potter*, 2010 WL 2196287, at *6 (W.D. Pa. June 1, 2010).  But in that case, the plaintiff had merely been *informed* that she would be fired (*i.e.*, she was told an adverse employment action was going to be taken), but the decision was changed *before* her termination took effect.  In *Gonzalez* the putatively adverse action was never taken; here, it was.  Ayala actually *was* suspended without pay, so a reasonable jury could find that an adverse action occurred.  (The extent to which he lost wages as a result is a question of damages, not liability.)

Defendants argue next that, even assuming *arguendo* an adverse action, Ayala cannot establish a *prima facie* case because he cannot show any circumstances that give rise to a reasonable inference of discrimination.  "There is no evidence," Defendants argue, "that [Ayala's] suspension had any relation whatsoever to [his] race."  As Defendants correctly note, a plaintiff's speculation that an adverse action was racially motivated is not enough; he must supply facts.  *See Paradoa v. Philadelphia Hous. Auth.*, 610 F. App'x 163, 166 (3d Cir. 2015)

("[S]peculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.").

But Ayala does not need to show that Garrett's alleged racist comments directly *caused* his suspension in some fashion to survive summary judgment.  "Remarks made by supervisors directly involved in the [adverse] decision at issue can be evidence of their discriminatory animus, even if the remarks were not made in connection with the [adverse] decision."  *Steward v. Sears Roebuck & Co.*, 231 F. App'x 201, 211 (3d Cir. 2007).  Here, Ayala has testified that Garrett referred to his race derogatorily—"sit your Puerto Rican ass down" and "you clean like a Mexican," and he testified that Garrett said it "when [he] got suspended [the second time].  In other words, the record includes evidence that Garrett, Ayala's supervisor, was involved in Ayala's suspension, and that Garrett made derogatory race-based comments about him both in connection with the suspension and at other times.  From this evidence a reasonable jury could conclude that Ayala's suspension "occurred under circumstances that could give rise to an inference of intentional discrimination."  *Makky*, 541 F.3d 205, 214 (3d Cir. 2008).

The *McDonnell Douglas* burden now shifts back to Defendants to articulate a legitimate nondiscriminatory reason for Ayala's suspension.  Defendants explain that Ayala was suspended because "Garrett believed that [Ayala] was behaving in a threatening manner and was potentially a safety risk," and it was "consistent with Tasty [Baking]'s practices when addressing a situation involving a threat of workplace violence" to "[s]uspend[] an employee pending investigation" who violates Tasty [Baking]'s Violence-in-the-Workplace policy by "[m]aking threatening remarks or remarks intended to antagonize."  Garrett also attested that Ayala "was acting like he was going to hit [him]."  Indeed, "[v]iolating a company policy—even if done previously without termination" (and even where threatening verbal or body language is not involved)—"is

a valid, nondiscriminatory basis" for taking an adverse employment action. *Gardner v. Ulta Salon Cosms. & Fragrance Inc.*, 2024 WL 1110384, at *2 n.6 (3d Cir. Mar. 14, 2024). And threats of violence, of course, are a valid, nondiscriminatory reason for an adverse employment action. *See, e.g.*, *Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 355 (3d Cir. 2010). Therefore, here, Defendants have successfully proffered a legitimate, nondiscriminatory reason for Ayala's suspension.

The burden flips back to Ayala to show that Defendants' explanation is pretext. As noted above, to carry this burden, Ayala must offer "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted).

Proving that an employer's proffered reason is pretextual requires more than reasserting the evidence that supported the *prima facie* case. Ayala must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

Ayala must point to *something* to rebut Defendants' proffered reason. The burden poses a particular challenge to him here because his Opposition to Defendants' Motion has been stricken. But, in any case, Ayala's testimony in deposition does not rebut Defendants' stated explanation for Ayala's February 2022 suspension—the closest he comes is his testimony that *Garrett* was acting threatening. Ayala has not shown any particular "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

14

legitimate reasons." *Id.* at 765.

"Even to defeat summary judgment, th[e] rebuttal burden is a 'difficult' one." *CPM Consulting LLC v. Capsugel US LLC*, 2021 WL 4438743, at *2 (3d Cir. Sept. 28, 2021) (quoting *Fuentes*, 32 F.3d at 765). Here, Ayala has not rebutted Defendants' proffered reason with any record evidence. In that Plaintiff has not met that burden, summary judgment will be granted on Ayala's Title VII and Section 1981 race-discrimination claims.

### 2. Disparate treatment: Disability discrimination and failure to accommodate under ADA

Like a race-discrimination claim under Section 1981 or Title VII, an ADA disability-discrimination analysis follows the *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). To establish a *prima facie* case, an ADA discrimination plaintiff must show that he: (1) has a disability; (2) is a qualified individual; and, (3) has suffered an adverse employment action because of that disability. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006). Defendants "assum[e] *arguendo*" that Ayala was disabled (the first prong), and they "do not dispute" that he was "qualified" (the second prong). They focus on the third prong:

> [A]s set forth [in their argument regarding Ayala's Section 1981 and Title VII discrimination claims], [Ayala] cannot show that he suffered an adverse employment action, and is thus unable to show that he suffered an adverse action *because* of discrimination based on a disability. For this reason alone, [Ayala]'s disability discrimination claim must be dismissed.

As explained above, Ayala has created an issue of material fact as to whether he was subjected to an adverse employment action. And Defendants make no further argument that Ayala's disability was unconnected to any adverse employment action.

ADA discrimination liability "depends on whether the protected trait . . . actually motivated the employer's [adverse employment] decision." *Lehenky v. Toshiba Am. Energy Sys.*

15

*Corp.*, 2023 WL 3562981, at *2 (3d Cir. May 19, 2023) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quotations removed)).  Assuming for the sake of argument that Plaintiff had met his *prima facie* obligation on this point,[6] the *McDonnell Douglas* burden would shift to Defendants to articulate a legitimate nondiscriminatory reason for his February 2022 suspension. As discussed above, Defendants have successfully proffered a nondiscriminatory reason for Ayala's suspension—that Ayala was acting threateningly—and Ayala has not successfully shown it to be pretextual.  Accordingly, summary judgment will be granted as to Ayala's disability disparate-treatment claim.

Ayala also claims that Defendants subjected him to ADA discrimination by failing to accommodate his reasonable requests.  As explained above, ADA disability-discrimination claims are evaluated under the *McDonnell Douglas* framework.  ADA discrimination, as Defendants note, includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).  Establishing a *prima facie* case of failure-to-accommodate discrimination requires showing that: (1) the employer knew about the employee's disability; (2) the employee asked for an accommodation or assistance; (3) the employer did not make a good-faith effort to accommodate the employee; and, (4) the employee could have been accommodated.  *Arana v. Temple Univ. Health Sys.*, 776 F. App'x 66, 71 (3d Cir. 2019) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999)).

Here, Ayala alleges that Defendants "refused to [] consider [his] requests for reasonable

---

[6] In deposition Ayala points to one interaction with Garrett that could support his *prima facie* case—he testified that Garrett said to him, "fuck you, you're not injured, do the job, if you can't do the job, I'll have somebody else do it." But he also testifies that interaction occurred "when [he] was in the pie line," and, as explained below, the pie-line incident is time-barred by the parties' stipulation.

accommodations."  In particular, he claims that "[n]early the entire year of 2020 and intermittently in 2021" he "requested light[-]duty assignment due to work[-]related injuries," but "Defendants refused to permit [him] to work light duty."  The record provides some evidence for the allegation:  Ayala attested in deposition that he "had made light[-]duty requests" and had "[e]ven . . . submitted documents" indicating that "[t]he doctor sa[id] for [him] to have light[-]duty work" after his injury.  Ayala testified in deposition that instead of giving him light-duty work, Garrett assigned him to "the pie line" (which involved operation of the ADCO-70, which Ayala called "the most difficult machine [o]n the production floor to operate").

Defendants argue first that any alleged refusal to accommodate before August 31, 2021, is time-barred, and the pie-line incident occurred before that date.  They note further that Ayala made several requests for time off during his employment, and they argue that because all those requests were granted they do not constitute a failure to accommodate, either.

As an initial matter, there is some confusion as to when the pie-line incident occurred. When asked in deposition when he was assigned to the pie line, Ayala said, "I think October of 2021" (which, if true, would mean it is not time-barred).  Defendants, though, say Ayala was assigned to the pie line in October *2020*.  They cite evidence in the record:  first, the doctor's note Ayala submitted recommending that he "be rotated off operations/maintenance of the ADCO-70 in the Pie Line" was dated "10/16/2020"; second, Ayala sent a long email to Johnston to document all his allegations, in which he says that he was on leave from September 27, 2021, to November 10, 2021, a period that includes the entire month of October 2021.[7]

---

[7] Ayala sent this email on February 28, 2022.  He testified that he sent it "[b]ecause of the ongoing attacks from Jack Garrett" and because he had been "filing . . . ongoing complaints and nothing is being done about it."  He further testified that he "had to document date and time when [he's] speaking to whoever [he's] speaking to about the different incidents because [he] ha[s] to protect [him]self."

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis added).  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Here, Ayala's statement in deposition that he "think[s]" the pie-line incident occurred in October 2021 is not enough to create a genuine dispute given the doctor's note Ayala himself produced and the email Ayala himself sent, which indicate that it occurred in October 2020—and therefore cannot be considered for the purpose of Ayala's failure-to-accommodate claim.  And, as Defendants note, Ayala has not identified any other accommodations he requested and was not granted.  *See Capps v. Mondelez Glob.*, LLC, 847 F.3d 144, 157 (3d Cir. 2017) (upholding summary judgment on a plaintiff's ADA failure-to-accommodate claim because the plaintiff's employer "continued to approve [his] requested leave, and indeed, [he] took the requested leave.")

Because Ayala has not established a *prima facie* case for failure to accommodate under the ADA summary judgment will be granted on that claim.

### 3.  *Retaliation under Section 1981, Title VII, and ADA*

Retaliation claims brought under Section 1981, Title VII, and the ADA all proceed according to the *McDonnell Douglas* framework, and all have the same *prima facie* elements.[8] To state a claim for unlawful retaliation, a plaintiff "must show that (1) []he engaged in a protected activity; (2) []he suffered an adverse employment action; and, (3) there was a causal

---

[8] *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) (race-based claim under Section 1981); *Kengerski v. Harper*, 6 F.4th 531, 536 n.3 (3d Cir. 2021) (race-based claim under Title VII); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (disability-based claim under the ADA).

connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). Title VII's anti-retaliation provision protects employees from employer actions that are serious enough to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006). A retaliation plaintiff "must show that a reasonable employee would have found the challenged action materially adverse." *White*, 548 U.S. at 68 (2006). The material-adversity standard "separate[s] significant from trivial harms." *Id.* In other words, the "ordinary tribulations of the workplace," like "petty slights or minor annoyances"—even if retaliatory—will not suffice, because "Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Id.*

Defendants argue that Ayala cannot make a *prima facie* case for retaliation for two reasons: first, although they acknowledge Ayala made "general complaints" about harassment and discrimination, these did not constitute protected activity because they did not specifically identify race- or disability-related circumstances (the first prong); second, Ayala has not suffered an adverse employment action (the second prong)[9]; and third, the record "is bereft of any facts establishing a causal connection between any of [Ayala]'s complaints and Tasty [Baking]'s 'actions'" (the third prong).

---

[9] Defendants lump their retaliation adverse action argument together with their argument regarding Ayala's alleged *discrimination* adverse action—but the definition of "adverse employment action" is not the same in the retaliation context. *See, e.g., Davis v. City of Newark*, 285 Fed. App'x. 899, 904 (3d Cir. 2008) ("In a claim of retaliation, the standard required to show an 'adverse employment action' differs from the standard used for claims of discrimination) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006); *see also Wahab v. New Jersey Dep't of Env't Prot.*, 2023 WL 8613617, at *1 n.5 (3d Cir. Dec. 13, 2023): "While an 'adverse employment action' is a required element to prove both discrimination and retaliation, the phrase is context[-]dependent. . . . [F]or a retaliation claim, an adverse employment action '[is one that] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (citations omitted).

First, Defendants argue that Ayala's "general complaints of unfair treatment" do not qualify as protected activity.  They note that Ayala "made a multitude of complaints to his supervisors and H[uman] R[esources], ranging from concerns about co-workers 'staring' at him to co-workers or managers [he] believed were 'unprofessional.'"  But, they say, there is no evidence that Ayala ever complained that he was being *discriminated* against, and they argue that a complaint only constitutes protected activity when it directly alleges discrimination.  Informal complaints may constitute protected activity, but Defendants are correct that they must allege "discrimination based on a protected category." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015); *see also McClain v. Avis Rent A Car Sys., Inc.*, 648 F. App'x 218, 224 (3d Cir. 2016) (citing *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) ("To engage in 'protected activity' a plaintiff cannot complain about merely unfair treatment, rather they must complain about discrimination based on membership in a protected class.").

Defendants are correct that Ayala's 2/28/22 email to Johnston captures many instances in which Ayala made general complaints.  For example, during the non-time-barred period he reported a "verbal disagreement with [Garrett] about being 'out of [his] workstation'" and having been "violated unprofessionally."  But the 2/28/22 email does not indicate that Ayala ever complained of race or disability discrimination.  Most of the instances of reporting discussed in Ayala's deposition do not indicate clearly that he made any non-time-barred discrimination complaints, either.  And there is no specific indication in the record that Ayala ever complained about disability discrimination in any fashion.

Without such a report, there can be no *prima facie* case of retaliation.  Therefore, no reasonable jury could find that Defendants retaliated against Ayala, so summary judgment will

20

be granted as to Ayala's retaliation claims under Section 1981, Title VII, and the ADA.

        a.   <u>Ayala's hostile-work-environment claims under Section 1981 and Title VII</u>

As noted above, hostile-work-environment claims are not analyzed under the *McDonnell Douglas* framework because "there can be no legitimate justification for a hostile work environment." *Moody v. Atl. City Bd. Of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017). A hostile-work-environment plaintiff must establish: "(1) the employee suffered intentional discrimination because of his/her [race], (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017); *see also Griffin v. Harrisburg Prop. Servs., Inc.*, 421 Fed App'x 204, 207 (3d Cir. 2011) (citing *AMTRAK v. Morgan*, 536 U.S. 101, 116 n.10 (2002)) ("[h]ostile work environment claims based on racial harassment are reviewed under the same standards as those based on sexual harassment.").

Here, Defendants attack the first and second prongs: They contend that Ayala cannot show intentional discrimination because of his race or that any discrimination was severe or pervasive.

### 1.  *Intentional discrimination*

Ayala's hostile-work-environment allegations center on remarks he says Garrett made to him.[10]  These have been recounted at length above:  "[D]ay in and day out," Ayala said in deposition, Garrett made hostile comments to him.  He says that Garrett told him to "sit [his]

---

[10] Unlike his other claims, per the parties' stipulation, Ayala's hostile-work-environment does not include any time bar.

Puerto Rican ass down" "several times" while he was on the pie line in October 2020, then again in July 2021, and then again in February 2022.  And he alleges Garrett said "you clean like a Mexican."

A reasonable jury could find that these incidents are tied to Ayala's race and, therefore, intentionally discriminatory.  *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996) ("[T]he pervasive use of derogatory and insulting terms directed at members of a protected class generally, and addressed to those employees personally, may serve as evidence of a hostile environment."); *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001) ("[A] disparaging comment directed at an individual's [] race . . . has the potential to create a[] 'hostile environment'—and thus come within the ambit of anti-discrimination laws— precisely because of its sensitive subject matter and because of the odious viewpoint it expresses.").

### 2.  Severity or pervasiveness

The Third Circuit has clarified that a hostile work environment can result when harassment is "severe *or* pervasive"—it need not be both.  *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017).  The Court explained that the "severe-or-pervasive" analysis is "context-specific" and "requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id.*

Defendants correctly note that "offhand comments, and isolated incidents (unless extremely serious) are not sufficient" to create a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  It must "amount to a change in the terms and conditions

of employment." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005).  Here, though, there is evidence that Garrett's treatment of Ayala was not "offhand," but rather *targeted*; not "isolated" but rather *continual*, to such an extent that it *did* change the "conditions" of Ayala's employment.  In deposition Ayala testified that Garrett's harassment (including but not limited to explicitly racial harassment) occurred "day in and day out" and significantly affected his "mental health difficulties."  In addition to comments about his race, he testified, Garrett "cuss[ed] [him] out," "[got] in [his] face talking aggressive[ly] and actually spitting while he was talking," once taunted him with "chicken noises," and on numerous occasions yelled at him to "shut the fuck up."

Title VII prohibits the hostility created by a combination of facially racial and facially neutral harassment of exactly the kind Ayala alleges.  The combined effect of "overt [ethnic] discrimination," plus "facially neutral mistreatment" can, "*in sum*," "constitute[] the hostile work environment." *Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001) (emphasis added).  Because of the "sophistication" of many Title VII violators, courts have an "obligation" to be "increasingly vigilant against subtle forms of discrimination."  *Id*.  Even *implicitly* racial comments (in that case, referring to Black employees as referred to as "another one," "one of them," "that one in there," and "all of you"), combined with other facially neutral mistreatment, are sufficient to establish a racially hostile work environment.  *Aman*, 85 F.3d at 1082.  "[A] reasonable jury could interpret" even merely "suspicious remarks" as "part of a complex tapestry of discrimination" when examined "in conjunction" with facially neutral behavior.  *Id*. at 1083.  In other words:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario . . . .  [T] he factfinder in this type of case should not necessarily examine each alleged incident of harassment in a vacuum.

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) (quotations and citations omitted).

Here Ayala has supplied enough.  He does not have to prove his case; he just needs to establish a genuine factual dispute, and he has.  He testified that Garrett "abuse[d]" him "day in and day out" in a manner that was at times explicitly racial.  Accordingly, summary judgment will be denied as to Ayala's hostile-work-environment claims.

>        ### iii.    *Count VI: Interference and Retaliation in Violation of FMLA (Against All Defendants)*
>
>            a.  <u>FMLA Interference</u>

Employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" of FMLA rights.  *Ross v. Gilhuly*, 755 F.3d 185, 191 (3d Cir. 2014); 29 U.S.C. § 2617.  And "[t]he Supreme Court [has] instructed that an employee who asserts an FMLA interference claim under 29 U.S.C. § 2617 is not entitled to any relief unless the employee has been prejudiced by the violation," which can be shown, for instance, by "adduc[ing] evidence of lost compensation or benefits, or any actual monetary losses."  *Henley v. Brandywine Hosp., LLC*, 2022 WL 2452307, at *2 (3d Cir. July 6, 2022) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (quotations removed).

Here, as Ayala acknowledges in deposition, he sought FMLA leave twice.  His first FMLA request, in connection with his workplace injury, began in February 2019.[11]  He used it for nearly a year for his surgery and recovery, then intermittently for physical therapy and injury flare-ups when he returned to work in 2020, and then for another continuous period between

---

[11] Defendants argue that any events before September 27, 2020, are barred by FMLA's two-year statute of limitations.  Whether correct or not, as will be explained, the timing does not affect the analysis here.

September 2021 and November 2021.  Finally, he has used it on an indefinite basis since March 2022.  He used his second FMLA leave, in connection with the death of his son, intermittently beginning in March 2021.

"[F]or an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld."  *Ross v. Gilhuly*, 755 F.3d 185, 192 (3d Cir. 2014).  Here there is no evidence that defendants ever prevented Ayala from using his FMLA leave, or that Ayala was denied an FMLA benefit.  Indeed, by Ayala's own acknowledgement, he used his FMLA leave frequently.  Accordingly, summary judgment will be granted as to Ayala's FMLA interference claim.

### b.  <u>FMLA retaliation</u>

Last, Ayala brings a claim for FMLA retaliation.  FMLA retaliation claims are analyzed under the *McDonnell Douglas* framework, so Ayala must first establish a *prima facie* case by showing that (1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) there is a causal connection between the adverse employment decision and the FMLA leave. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014).

Defendants argue simply that Ayala cannot show he suffered any adverse employment action at all (much less one causally connected to his using FMLA leave).

The Third Circuit has imported the Title VII notion of "adverse employment action" in FMLA retaliation cases.  *See, e.g.*, *Clark v. Philadelphia Hous. Auth.*, 701 F. App'x 113, 117 (3d Cir. 2017).  Therefore, to the extent Ayala claims that his second suspension is the relevant adverse employment decision, that claim fails when the *McDonnell Douglas* framework is applied to it for the reasons articulated above:  Defendants supplied a legitimate nonretaliatory reason for Ayala's suspension, and Ayala did not rebut it.

25

Here, though, Ayala's *first* three-day suspension without pay, in July 2021, is not time-barred by the parties' stipulation, or barred by the FMLA's statute of limitations.  As explained above, Ayala's suspension without pay qualifies as an adverse action, even if it was later reversed.  As to that suspension, though, Defendants again articulate a legitimate nondiscriminatory reason:  Ayala had had a "verbal altercation" with Tyrone Newell, and Ayala had suggested that he and the Newell "meet elsewhere to settle their differences."  As evidence Defendants cite Johnston's declaration, in which she attests that Newell said Ayala threatened to fight him; Garrett's declaration, in which he attests that Ayala said to him "something along the lines of there was a place outside the building where he and Mr. Newell could take care of their issues"; and a note written by Garrett immediately after the incident, in which Garrett recounted the same, and added that he felt letting Ayala back on the shop floor would "create a disruption [and] an unsafe work environment."  As explained above, use of threatening language is a legitimate reason for suspension.

The burden, accordingly, shifts back to Ayala to provide evidence that the proffered reason was pretextual.  But in deposition he only says that "[t]he meeting didn't go according to [] Garrett, so [] Garrett ends up sending me home with a three-day suspension with intent to terminate."  As explained above, proving pretext requires using evidence to specifically engage with the proffered justification, though, not just making a general denial.  *See Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994) (To show pretext a plaintiff "must *submit evidence* which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or, (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.").  Here the record does not undermine Defendants'

26

proffered reason, so, like his second suspension, a reasonable jury could not conclude that

Ayala's first suspension provides a reason to deny summary judgment.

Accordingly, summary judgment will be granted as to Ayala's FMLA retaliation claim.[12]

### D.  CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment will be granted in part and

denied in part.

An appropriate order follows.

BY THE COURT:

 /s/**Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

DATE: 08/21/24

_____

[12] Ayala says in deposition that he was wrongly assigned "attendance points" on several occasions.  It is not clear to what extent he intended to characterize these as adverse actions, but in any case, they do not qualify.  There is no evidence these "points" altered Ayala's "compensation, terms, conditions, or privileges of employment," or "deprive[d] him [] of employment opportunities, or adversely affect[ed] his status as an employee."  In fact, Ayala says he received at least 20 points and was never fired, even though he agreed policy provided he "could be terminated" after nine points.  Because the points did not affect his conditions of employment, they do not count as adverse actions, either.